

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-10-00186-CR**

TIMMY JAY TAMPLEN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Timmy Jay Tamplen appeals his conviction for burglary of a building.[2] In two issues, Tamplen argues that the State failed to provide sufficient evidence at trial that he intended to commit a theft when he admittedly entered a building and removed scrap metal from it. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. § 30.02(a)(3) (Vernon 2003).

## II. BACKGROUND

At trial, Jeffery Ward testified for the State. Ward owns land in Wise County, Texas, near Highway 114. Ward lived on the land before a fire burned down his house, his dad's house, and his dad's shop. All that was left standing after the fire was the burned shop. Ward testified that the shop contained burned tools and scrap metal. Ward also said that from the highway, it would appear that no one lived on the land. Even after the fire, Ward still collected his mail from the property, and on May 8, 2008, he went to his property to retrieve his mail on his way to pick up his daughter from school.

When Ward first arrived on his land, he could not see that someone else was there, but when he backed up to his mailbox, he saw the front of a red pickup truck near the shop. Ward immediately went to confront whoever was on his property because, by his account, no one else should have been there. Ward encountered Tamplen and another man. The other man was standing next to the truck, and Tamplen "was inside the shop carrying stuff out." At trial, Ward identified Tamplen as the man who had come out of his shop carrying scrap metal. Ward said that he confronted the two men. According to Ward, Tamplen said that he and the other man had been hired by Mr. and Mrs. Wright to help clean up the property and that they were intending to tear down the shop. By his own account, Ward responded angrily and then called 9-1-1. Ward described the location of Tamplen's truck as being a place where you would park if you did not want to be seen from the highway. Ward testified that although he knew who the

2

Wrights were, he had never granted anyone permission to be on his property that contained the shop. Ward said that he was in the process of selling the scrap metal from the shop himself in an effort to raise money to rebuild his own home.

Deputy Richard Luke Campbell of the Wise County Sheriff's office also testified for the State. Campbell responded to Ward's 9-1-1 call. Campbell said that when he arrived, Ward was in his own vehicle and that Tamplen and another man were standing near Tamplen's truck. Ward was visibly upset. Campbell described Tamplen's behavior as "constantly moving," "twitching," and "evasive about answering questions." Much like he had explained to Ward, Tamplen told Campbell that he had been on the property the evening before and that Mrs. Wright had asked him to remove some items from the property. Campbell testified specifically about Tamplen's explanation for having been on Ward's property the day before: "It didn't make a whole lot of sense. I was trying to figure out why he had been out there the previous evening; that's where his answers were evasive. He really couldn't give an explanation for why he was out there the day before." Because of Tamplen's story, Campbell called Mrs. Wright. Campbell described his phone conversation with Mrs. Wright:

> I basically asked her if she had given--given anybody permission to go onto that property? She said, no. That she had seen a guy out there the previous evening, who identified himself as Tim. And had asked him if he knew Mr. Ward? And she believed that he did know Mr. Ward. And she said that he hadn't been there in a while, and was wanting to know if Mr. Ward needed some help leveling off a piece of the property?
>
> . . .

3

She explicitly said she did not give anybody permission to be out there?

Campbell said that after speaking with Mrs. Wright, he placed Tamplen under arrest.

The State called Sandra Kay Wright as well. Mrs. Wright testified that she barely knew Ward. Mrs. Wright said that she had been working with a nonprofit organization to help build homes destroyed by the same fire that had destroyed Ward's home. She went to Ward's land because she needed to speak with him. By her account, Mrs. Wright saw Tamplen on Ward's property as she was driving by on May 7, 2008. She testified that she had assumed that Tamplen knew Ward or worked for him because Tamplen was on Ward's property. According to Mrs. Wright, Tamplen was standing near the site of Ward's former house, so she approached Tamplen and asked if he knew Ward. Mrs. Wright said that Tamplen affirmatively gestured that he did know Ward. Mrs. Wright told Tamplen that she was trying to reach Ward. During her conversation with Tamplen, Mrs. Wright told Tamplen that she needed to speak to Ward about the nonprofit organization preparing the foundation site for his new home. She gave Tamplen her phone number and asked him to have Ward call her about the foundation site. Mrs. Wright denied ever giving Tamplen permission to enter Ward's property or to remove anything from the shop. She testified that she had assumed that Tamplen had Ward's permission to be on his property because he was there

when she arrived. Mrs. Wright also testified that Tamplen never gave her his own phone number.

Douglas Lee Wright—another State's witness and Mrs. Wright's husband—testified that the Wrights lived within two miles of Ward's property and that the first time he had heard of Mrs. Wright's conversation with Tamplen was when Campbell called his home on May 8, 2008. The Wrights' home was also destroyed by the fire. Mr. Wright said that he had never met Tamplen, did not hire him to clean up Ward's property, and had no authority from Ward to give anyone permission to enter his property.

Tamplen testified on his own behalf. According to Tamplen, Mrs. Wright approached him on May 7, 2008, introduced herself, and asked "if [he] could be out there the next day." Tamplen said that he believed Mrs. Wright owned the property and that she had employed him to clear the land. Tamplen said that Mrs. Wright asked him to come back with a trailer so that he could haul off debris and tear down the burned shop. Tamplen said that he gave her his "card," which contained his telephone number. Tamplen averred that after renting a trailer, he and his brother returned the next day to clean the property and then Ward arrived, angry and yelling. Tamplen said that he tried to explain to Ward that Mrs. Wright had hired him, that Ward would not listen, and that Ward called Campbell, who arrived shortly and arrested Tamplen. The jury found Tamplen guilty and assessed punishment at ten years' incarceration and a $500 fine. This appeal followed.

5

### III. DISCUSSION

In two points, Tamplen challenges the sufficiency of the evidence to support his conviction. Tamplen does not dispute that he entered Ward's property or that he removed scrap metal from the shop and loaded it onto a truck and trailer; Tamplen contends only that the evidence is insufficient to prove that he intended to commit a theft. We disagree.

### A. Standard of Review

Although Tamplen challenges both the legal and factual sufficiency of the evidence to support the conclusion that he entered Ward's shop with the intent to steal the scrap metal found inside, the court of criminal appeals has held that there is no meaningful distinction between the legal sufficiency standard and the factual sufficiency standard. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)). Thus, the *Jackson* standard, which is explained below, is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* Accordingly, we will apply this same standard of review to both of Tamplen's sufficiency complaints.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*,

443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a

7

charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App.), *cert. denied*, 130 S. Ct. 515 (2009); *Malik*, 953 S.W.2d at 240. However, we may not affirm a conviction based on legal or factual grounds that were not submitted to the jury. *Malik*, 953 S.W.2d at 238 n.3. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000).

## B. Intent to Commit a Theft

It is well settled in this state that the question of the intent with which a person unlawfully enters a building is a fact question for the jury to be drawn from the surrounding circumstances. *Moreno v. State*, 702 S.W.2d 636, 641 (Tex. Crim. App. 1986); *Stearn v. State*, 571 S.W.2d 177, 177 (Tex. Crim. App. [Panel Op.] 1978) (holding evidence of intent to commit theft sufficient when defendant was found in residence's kitchen and immediately fled, even though nothing in house had been disturbed). That is, the jury is exclusively empowered to determine the issue of intent, and the events of a burglary may imply the intent with which the burglar entered the property at issue. *Moreno*, 702 S.W.2d at 641; *Joseph v. State*, 679 S.W.2d 728, 730 (Tex. App.—Houston [1st Dist.] 1984, no pet.).

In this case, when considering the evidence in the light most favorable to the jury's verdict, the record demonstrates that Tamplen did not have Ward's permission to be on his property. Mrs. Wright, the person whom Tamplen claims gave him permission to be on Ward's property, testified that she did not give him permission to be on the property and that Tamplen falsely represented to her that he knew Ward the day before Ward discovered Tamplen on the property. She also testified, contrary to Tamplen, that he had not given her his contact information. The evidence also shows that Tamplen parked his truck and trailer in a place consistent with a person who was trying to keep his presence on the property hidden. Ward witnessed Tamplen loading Ward's property on Tamplen's trailer and truck. Moreover, Tamplen admitted entering Ward's property and loading the scrap metal. And Campbell testified that Tamplen could not explain why he was on Ward's property the day before.

We conclude and hold that a rational factfinder could have found that Tamplen intended to commit the theft of removing scrap metal from the shop on Ward's property and that a rational factfinder was free to disbelieve Tamplen's story that he believed that he had been hired to remove the property from the shop. *See James v. State*, 48 S.W.3d 482, 487 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (holding that whether a defendant's explanation regarding his possession of stolen property is reasonable or false is an issue to be decided by the factfinder); *see also Roane v. State*, 959 S.W.2d 387, 389 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (reasoning that a jury is empowered to

9

determine the issue of intent in prosecution for attempted burglary of habitation).

Thus, we overrule both of Tamplen's issues.

## IV. CONCLUSION

Having overruled both of Tamplen's issues, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 28, 2011

10